**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**TAGGART SHAWN WOLFE,**

      **Plaintiff,**

**v.**                                        **Case No. 3:12-cv-08931**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   Procedural History

Plaintiff, Taggart Shawn Wolfe ("Claimant"), filed for DIB and SSI on August 24, 2010 alleging a disability onset date of August 1, 2008, (Tr. at 130, 134), due to severe

COPD, back trouble, neck trouble, nerves, and carpal tunnel syndrome. (Tr. at 149). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 61, 71). Claimant filed a request for a hearing, (Tr. at 85), which was held on December 5, 2011 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 25-56). By written decision dated January 23, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-24). The ALJ's decision became the final decision of the Commissioner on October 9, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On December 13, 2012, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the proceedings on February 15, 2013. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is ripe for resolution.

## II.   **Claimant's Background**

Claimant was 44 years old at the time of his alleged onset of disability and 47 years old on the date of his administrative hearing. (Tr. at 31, 130). He attended school up to eleventh grade and subsequently obtained a GED. (Tr. at 30). Claimant has prior work experience as a cook, chef, and kitchen supervisor. (Tr. at 51). He communicates in English.

## III.   **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of

substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment

meets or is equal to a listed mental disorder. *Id. §§* 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2011. (Tr. at 12, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since August 1, 2008, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "osteoporosis of the lumbar spine and cervical spine, herniated nucleus pulpous of the cervical spine, chronic obstructive pulmonary disorder, carpel tunnel syndrome, shoulder impingement syndrome, internal derangement of the left knee, a history of substance abuse, attention deficit hyperactivity disorder, anxiety, depression and personality disorder." (Tr. at 12-14, Finding No. 3). However, the ALJ found that Claimant's ankle and arm pain were not severe impairments, and his alleged eating disorder was a non-medically determinable impairment. (Tr. at 13). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination did not meet or medically equal any of the listed impairments. (Tr. at 14-16, Finding No. 4). Consequently, the ALJ determined that Claimant had the RFC to:

> [P]erform light work. He can occasionally operate foot controls with the left lower extremity. He can never kneel or crawl. He can occasionally climb, stoop and crouch. He can frequently reach with both upper extremities, but can only occasionally reach overhead with both upper extremities. The claimant can frequently handle, finger and feel. He must avoid concentrated exposure to extreme cold; extreme heat; wetness; humidity; excessive vibration; and irritants such as odors, fumes, dust, gasses and poorly ventilated areas. He must avoid even moderate exposure

to hazards such as moving machinery and unprotected heights. The claimant is able to learn and perform routine, repetitive work-like activities in a setting with limited (defined as occasional) interaction with others.

(Tr. at 16-22, Finding No. 5). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 22, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine if he would be able to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in born in 1964 and was defined as a younger individual; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's determination that Claimant was "not disabled." (Tr. at 22, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 22-23, Finding No. 10). At the light level, Claimant could work as an inspector or a routing clerk; and at the sedentary level, Claimant could perform jobs such as a sorter and an inspector. (Tr. at 23). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (*Id.*, Finding No. 11).

## IV.   __Claimant's Challenges to the Commissioner's Decision__

Claimant argues that the Commissioner's decision is not supported by substantial evidence. (ECF No. 11 at 4-10). Claimant contends that "[o]bviously, [his] physical and mental impairments in combination equal a Listed Impairment," or in the alternative that "it is [his] position that his impairments prevent him from engaging in substantial gainful activity." (*Id.* at 5-6). More specifically, Claimant asserts that the ALJ (1)

improperly evaluated Claimant's credibility. (*Id.* at 6-9); and (2) disregarded the opinion of the vocational expert regarding Claimant's ability to engage in substantial gainful activity. (*Id.* at 9-10).

## V.   Relevant Medical Records

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

Between November 2004 and May 2005, Claimant was treated by H.S. Ramesh, M.D., for left shoulder and neck pain, (Tr. at 386-417), due to an accident at a grocery store occurring on November 4, 2004, in which "the structure holding the doors broke apart and the structure hit him in the back and knocked him up against the [pay] phone" he was using. (Tr. at 386). Claimant's December 23, 2004 cervical spine MRI revealed "a right central and posterolateral disc herniation at C5-6 and generalized bulging annulus versus broad based disc protrusion at C6-7 causing an acquired spinal stenosis at the level," but his left shoulder MRI revealed an "[u]nremarkable left shoulder exam with no abnormal joint or bursal fluid and no apparent rotator cuff tendon tear." (Tr. at 405). On January 28, 2005, electrodiagnostic studies of Claimant's bilateral upper extremities were conducted "to rule out cervical radiculopathy v/s peripheral compression with neuropathy." (Tr. at 408). Although there was no evidence of ulnar neuropathy, radial neuropathy, cervical radiculopathy, peripheral neuropathy, or myopathy, there was evidence of "sensory/motor compression neuropathy at bilateral wrist due to carpel tunnel syndrome at bilateral wrist, right moderate degree, left mild degree," and Claimant was also diagnosed with "C5-6 HNP as per MRI" and "cervical

facet syndrome." (Tr. at 409). Claimant attended physical therapy three times per week, received monthly joint injections for pain, and continued to work a "modified duty" of light work with limited lifting, pushing, and pulling. (Tr. at 386-417).

On November 10, 2008, Claimant was examined by neurologist Robert Lee Lewis II, M.D. with "complaints of neck pain that moves down his left arm" and "complaints of paresthesia [in] both hands." (Tr. at 237). Nerve conduction studies revealed "moderate right and mild left carpal tunnel syndromes," but there was "no evidence of ulnar neuropathies" and Claimant's "reduced left ulnar sensory nerve action potential amplitude [was] felt to be non-specific and related to a *[sic]* calloused hands." (Tr. at 238). There was also "no definite evidence of a left cervical radiculopathy." (*Id.*).

X-ray results of Claimant's chest dated February 28, 2009, reflect that Claimant's heart size was normal; emphysematous changes were "seen bilaterally within the lungs"; a 2.2 cm nodular density was present within the right upper lobe, but there was "[n]o focal consolidation within either lung"; and "[e]arly anterior osteophytic lipping [was] present within the mid thoracic spine." (Tr. at 254).

On March 5, 2009, Claimant met with M.C. Shah, M.D. for a DHHR physical and to review the results of his chest x-ray.[1] (Tr. at 255). On March 16, 2009, Claimant complained of neck pain, and Dr. Shah observed that his respiratory "auscultation rhythm" was abnormal. (Tr. at 256). On April 16, 2009, Claimant complained of breathing trouble, and Claimant's respiratory auscultation rhythm was again observed as abnormal, as was his psychiatric orientation. (Tr. at 257). On July 9, 2009, Claimant complained of trouble breathing, but his physical examination was entirely within normal limits. (Tr. at 258). On November 2, 2009, Claimant reported "not feeling well"

---

[1] Claimant apparently began receiving medical treatment from Dr. Shah in November 2006, (Tr. at 245), but the administrative record is void of treatment notes from Dr. Shah prior to March 2009.

and experiencing aches and chills, while his respiratory auscultation rhythm was observed as normal. (Tr. at 259).

Claimant was treated by Dr. Shah several times per month in 2010. (Tr. at 261-81, 332-39). Throughout this time, Claimant received medication refills and complained of breathing difficulty and lung pain. (*Id.*). Beginning in July 2010, Claimant also began to complain of neck, shoulder, and back pain. (Tr. at 275, 279-81).

X-ray results dated October 20, 2010 revealed that Claimant's heart was "normal in size," but his lungs were "hyperinflated and emphysematous in appearance." (Tr. at 288). However, there was "no evidence of pulmonary infiltrate or edema." (*Id.*). Accordingly, Claimant was diagnosed with COPD, but had "no acute cardiopulmonary abnormality." (*Id.*). X-ray results of Claimant's lumbar spine were entirely negative as there was "normal lumbar vertebral alignment," his "vertebral body and disc space heights [were] maintained," there was "no evidence of spondylolysis," and "no acute bony abnormality." (Tr. at 289).

Claimant continued to be treated by Dr. Shah between January 2011 and April 2011, throughout which he received medication refills and complained about neck and other "aches and pain." (Tr. at 340-42, 418-22). Claimant testified at the December 5, 2011 administrative hearing that he had ceased treatment with Dr. Shah four or five months prior when Dr. Shah "just quit seeing people." (Tr. at 35).

### B. Medical Evaluations and RFC Opinions

#### 1. *State Agency Physical Evaluations*

On November 19, 2010, Robert Holley, M.D. conducted a physical examination of Claimant. (Tr. at 308-17). In his review of systems, Claimant reported daily sinus congestion and coughing, as well as "left chest pain two days per week greater than one

year lasting 1 to 1.5 hours per episode" which is "non-exertional accompanied by shortness of breath, non-radiating." (Tr. at 308-09). Claimant also reported a "[c]hronic dull ache in the cervical spine area, present for five years, radiates to the left elbow with decreased grip on the left" and "[l]umbar pain also greater than two years," as well as "non-radiating pain in the right knee present greater than five years, aggravated by activity, decreased with medication and rest." (Tr. at 309). Claimant denied "red, hot, swollen joints but [reported] clicking of the right knee and occasionally locking of the right knee." (*Id.*). He rated his pain level during examination as 6, with a maximum pain level of 9, average of 8, and minimum of 6 on a scale of 10. (*Id.*). Claimant was "able to sit 30 minutes, stand without difficulty, and walk without difficulty." (*Id.*). Claimant reported "headaches present for one month, occipital, four days per week" which he "described as throbbing and increased with activity, lasting one to two hours." (*Id.*). Claimant also reported experiencing daily symptoms of chronic depression, which included "decreased eating, increased fatigue, decreased interest in pleasure, no suicidal ideation, and increased irritability." (*Id.*).

Claimant's physical exam reflected that his vital signs, HEENT, chest, heart, abdomen, central nervous system, and dermatologic/lymph nodes were all largely unremarkable. (Tr. at 310). Examination of Claimant's neck revealed "mild diffuse tenderness at the base of the cervical spine" but no masses or mastoid tenderness to percussion, and his Kernig and Brudzinski signs were negative. (*Id.*). Inspection of Claimant's musculoskeletal system was "unremarkable" although Dr. Holley did observe "[t]enderness at the base of the cervical spine, lumbar area, L3-S1 area midline, and in the right knee with obvious bony deformities" as well as "1+ crepitus on the right knee" (*Id.*). Additionally, Claimant's gait was "antalgic favoring right lower extremity." (*Id.*).

Regarding Claimant's psychiatric health, Dr. Holley observed that his mood and affect were normal, he was oriented to time, person and place, and both his short and long term memories were normal. (*Id.*). Range of motion testing revealed diminished flexion in both shoulders with pain in the right shoulder, diminished abduction with pain in the right shoulder, diminished cervical spine lateral flexion to the right with no pain, diminished cervical spine extension, diminished lumbar spine flexion and extension, and diminished lateral flexion to the right and left with mild pain in the lumbar area. (Tr. at 310-13). Claimant's effort was observed as "fair." (Tr. at 311). He "used no assistive devices for ambulation" and "was able to stand, walk, mount, and dismount the examination table with minimal difficulty" as well as "heel and toe walk without difficulty and squat 100% without difficulty." (*Id.*). Pulmonary function testing "revealed moderately severe obstruction." (Tr. at 311, 314-17).

Based upon his examination, Dr. Holley diagnosed Claimant with chronic obstructive pulmonary disease, right shoulder impingement, osteoporosis of the cervical spine with left cervical radiculopathy, osteoporosis of the lumbar spine, internal derangement of the right knee, "chest pain, recurrent, unknown etiology," nocturia, new onset of headaches, depression, hyperlipidemia, and myopia. (Tr. at 311).

On November 24, 2010, Rabah Boukhemis, M.D. provided a physical RFC opinion of Claimant based upon Dr. Holley's examination. (Tr. at 318-25). Dr. Boukhemis opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 319). Dr. Boukhemis opined that Claimant could frequently balance, stoop, and kneel; occasionally crouch and climb

ramps, stairs, ladders, ropes, scaffolds; and could never crawl. (Tr. at 320). Dr. Boukhemis assigned no manipulative, visual, or communicative limitations to Claimant. (Tr. at 321-22). As for environmental limitations, Dr. Boukhemis opined that Claimant could withstand unlimited noise; should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and irritants such as fumes, odors, dusts, gases, and poor ventilation; and should avoid even moderate exposure to hazards such as machinery and heights. (Tr. at 322).

On April 11, 2011, C. Bancoff provided case analysis as to Claimant's respiratory system in light of treatment notes from January 2011. (Tr. at 361). The evaluator considered an abnormal chest exam dated January 13, 2011, but noted that Claimant's January 27, 2011 respiratory exam/status was normal. (*Id.*). Accordingly, Dr. Boukehmis' assessment was "affirmed as written." (*Id.*).

### 2. *Claimant Referral Physical Evaluation*

On November 21, 2008, Robert W. Lowe, M.D. conducted a physical examination and consultative evaluation regarding Claimant's shoulder and neck pain pursuant to a referral from his attorney. (Tr. at 240-51). The evaluation included a review of history, review of medical records and treatment notes, range of motion testing, and an x-ray exam of Claimant's cervical spine. (*Id.*). In his history of present illness, Claimant relayed his November 2004 injury and related treatment. (Tr. at 240-41). Claimant reported that his neck and upper back hurt all the time and that his "neck sort of pops and has grinding and crepitus when he moves his neck." (Tr. at 241). Claimant described "pain radiating down the left arm and into the shoulder," constant back pain, and "numbness and tingling in the left arm and hand a couple of times a day, somewhat briefly." (*Id.*). Claimant reported that his worst pain occurs "underneath the shoulder

blade on the left side," (*Id.*), and that it is exacerbated by doing cooking prep work, cold weather, and riding. (Tr. at 242). Claimant reported that heat and ice occasionally alleviate pain, and that pain medication no longer helps as much as it previously did. (*Id.*). Claimant reported that he had "been out of work the past 4-5 months" but that he was "currently trying to get on boats," that is he "wants to be a cook on the river." (*Id.*). Dr. Lowe reviewed Claimant's neck and back treatment records, which included his initial emergency room visit, and treatment notes from Dr. Ramesh and Dr. Shah. (Tr. at 242-46).

Dr. Lowe observed that Claimant's "[r]ange of motion of the cervical spine was rather good" and that he could "extend the cervical spine 40 degrees" and "flex 52 degrees, complaining of pain at the endpoint of flexion." (Tr. at 246). Claimant's "[l]eft shoulder internal and external rotation was essentially normal, but he had some pain at the extremes," while abducting 180 degrees was painful. (Tr. at 247). Left extension caused pain under the shoulder blade at 45 degrees, while left should adduction was normal, and right shoulder had full range of motion. (*Id.*). According to Dr. Lowe, the "most significant finding" was "prominence or winging of the left scapula" when Claimant placed his hands on the wall and pushed. (*Id.*). Claimant again reported that "most of the pain [was] along the medial to inferior border of the left scapula, and beneath the left scapula." (*Id.*). X-ray results of claimant's cervical spine revealed "C/7, T/1 uncovertebral spurs on the right oblique x-rays, i.e. the left side," which "tends to encroach upon the foramen at C/7, T/1." (Tr. at 248). Dr. Lowe also noted "hypertrophic spurring. . . at the C/5/6 and C/6/7 level, with some calcification in the anterior longitudinal ligament but with disc height maintained." (*Id.*).

Dr. Lowe diagnosed Claimant with "winging of left scapula, painful," "positive

MRI with neck pain, generally resolved," and "herniated nucleus pulpous cervical spine right, apparently asymptomatic." (Tr. at 248). In response to specific questions posed by Claimant's attorney, Dr. Lowe opined that Claimant did suffer an injury in the November 4, 2004 accident, noting that Claimant "apparently got hit in the back, strained and bruised the tissues around the scapula and, to some extent, decreased the ability of the body to hold the scapula next to the chest wall in a perfectly normal manner," and also "sprained his neck and aggravated pre-existing conditions within the cervical spine at C/5/6, and may or may not have aggravated a bulging disc at C/6/7." (Tr. at 248-49). Dr. Lowe opined that the "winging of the scapula" and related pain was permanent, but that Claimant's "sprain of the cervical spine" had, "for practical purposes, resolved." (Tr. at 249). In response to inquiry as to whether Claimant had ever been "disabled from normal daily activities" as a result of his November 2004 injury, Dr. Lowe noted that Claimant "was, for a period of time, placed on light duty by his treating doctor," which constituted "a variant from normal daily activity," but that "he was able to work at a variety of jobs as a chef, i.e. his normal daily activity." (*Id.*). Dr. Lowe found that there was objective evidence to support Claimant's subjective complaints of pain beneath the scapula, in that his "shoulder sticks out from the chest, if he really tries to push the wall into the next room." (Tr. at 250). Dr. Lowe did not believe that Claimant would ultimately require an operation for his shoulder, and noted that he had "seen several people like this" including one woman who similarly experienced pain beneath the scapula throughout a 20 year medical relationship, during which she continued to work at a factory and participated in volunteer efforts throughout her community. (Tr. at 250-51). From there, Dr. Lowe extrapolated that Claimant "is weak around the shoulder, and it will continue to persist, but he will be able to function. I'll bet if he gets

a job on a boat, he will be a good cook and will keep that job." (Tr. at 251).

### 3. *State Agency Mental Evaluations*

On September 15, 2010, Emily E. Wilson, M.A. completed an adult mental profile of Claimant, consisting of a clinical interview, mental status examination, intelligence testing, and an interview with Claimant's mother. (Tr. at 282-87). During the interview, Claimant reported experiencing symptoms of anxiety which included "difficulty controlling his worry and irritability," and stated that he "get[s] frustrated easily and [his] nerves are shot." (Tr. at 283). Claimant denied symptoms of depression. (*Id.*). Claimant reported a history of counseling at the age of 3, after he "was hit by a car and had to relearn to walk and talk." (*Id.*). Claimant reported consuming "a couple of beers" during the last 12 months, and that "he was incarcerated for possession of cocaine in 1988 or 1989 'off and on for 8 years'" while living in Florida. (*Id.*).

Claimant reported activities of daily living consisting of self-care tasks such as grooming and hygiene, cleaning, cooking, driving "but he does not drive at this time," shopping, and handling his own finances. (Tr. at 284). Claimant's intelligence testing was unremarkable. (Tr. at 284-85).

In his mental status exam, Claimant's judgment was observed as somewhat deficient because when asked what he could do with a letter he found on the sidewalk, he stated he "would leave it probably, but [he] might mail it, it all depends." (Tr. at 285). Claimant's psychomotor activity was observed as elevated, as he "was fidgety, blurted out, interrupted and exhibited impulsivity," while his pace was "somewhat fast," as he "talked at a fast rate and worked quickly and somewhat impulsively." (Tr. at 286). Regarding social functioning, Claimant reported that he does not have many friends. (*Id.*). Otherwise, Claimant's appearance, attitude and behavior, social interaction,

speech, orientation, mood, affect, thought process, thought content, perception, insight, immediate memory, recent memory, remote memory, concentration, and persistence were all within normal limits, and he denied suicidal/homicidal ideations. (Tr. at 285-86). Accordingly, Ms. Wilson diagnosed Claimant with "attention deficit hyperactivity disorder, not otherwise specified," "anxiety disorder, not otherwise specified," and "history of cocaine abuse" along Axis I, and "personality disorder, not otherwise specified with characteristics of antisocial and borderline personality disorder" along Axis II, based upon Claimant's report of symptoms and history as well as his presentation during the evaluation. (Tr. at 286). Ms. Wilson opined that Claimant's prognosis was "good if he is able to obtain consistent and appropriate psychotropic and psychological interventions." (Tr. at 287).

On October 25, 2010, Jeff Boggess, Ph.D. provided a psychiatric review technique and mental RFC opinion based upon Ms. Wilson's evaluation. (Tr. at 290-307). Dr. Boggess diagnosed Claimant with ADHD NOS, Anxiety NOS, and a personality disorder NOS. (Tr. at 295, 299, 301). Dr. Boggess concluded that Claimant did not meet any of the mental impairment Listings as he was only mildly limited in his activities of daily living; moderately limited in maintaining social functioning; had no limitations in maintaining concentration, persistence, or pace; and suffered from no episodes of extended decompensation. (Tr. at 304-05). Dr. Boggess noted that Claimant alleges nerves but has "no psych treatment." (Tr. at 306). Regarding Claimant's ADHD, Dr. Boggess observed that Claimant's "mental status exam shows concentration within normal limits and ADHD cannot be established during childhood period (symptoms reported at consultative examination can be explained by numerous other problems/behaviors)." (*Id.*). Dr. Boggess further observed that Claimant's social

allegations of problems getting along with others were "supported by history" whereas his other functional allegations of problems with memory, concentration, and understanding were "not supported by objective testing." (*Id.*). Accordingly, Dr. Boggess concluded that "Claimant appears partially credible as per allegations." (*Id.*).

Regarding Claimant's mental RFC, Dr. Boggess opined that Claimant was "moderately limited" in his abilities to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 291). Otherwise, Dr. Boggess opined that Claimant was "not significantly limited" with respect to all other functional capacities relating to understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (Tr. at 290-91). Dr. Boggess further opined that "Claimant retains the ability for work activity with limited contact with the general public." (Tr. at 293).

On April 8, 2011, Holly Cloonan, Ph.D. provided a psychiatric review technique and RFC opinion of Claimant based upon Ms. Wilson's evaluation. (Tr. at 343-60). Dr. Cloonan diagnosed Claimant with ADHD NOS, anxiety disorder NOS, personality disorder NOS, and a history of cocaine abuse. (Tr. at 344, 348, 350-51). Dr. Cloonan concluded that Claimant did not meet any of the Listed mental impairments as he had only "mild" limitation in his activities of daily living; "moderate" limitation in his abilities to maintain social functioning and to maintain concentration, persistence, or pace; and suffered from no episodes of extended decompensation. (Tr. at 353-54). Dr. Cloonan further noted that "Claimant appears credible and alleges difficulty in concentration, consistent with his psychiatric symptoms and perhaps intermittent pain symptoms." (Tr. at 355). Furthermore, "treatment source notes reflected ongoing treatment and Claimant may have some moderate limits in mental FC as well as limits

in social FC, associated with personality disorder." (*Id.*).

Regarding Claimant's mental RFC, Dr. Cloonan opined that Claimant was "moderately limited" in his abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 357-58). Otherwise, Dr. Cloonan opined that Claimant was "not significantly limited" with respect to all other functional capacities relating to understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (*Id.*). Dr. Cloonan further opined that "Claimant may have the above moderate limits in concentration, persistence, and pace and social functional capacity associated with his mental condition" but that "he is able to learn and perform routine repetitive work-like activities in a setting with limited interactions with others." (Tr. at 359).

## VI.   <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered all of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.   <u>Analysis</u>

Claimant alleges that the Commissioner's decision is not supported by substantial evidence on the ground that his physical and mental impairments in combination equal a Listed Impairment, or in the alternative that his impairments prevent him from engaging in substantial gainful activity. (ECF No. 11 at 5-6). In support of his claims, Claimant argues that the ALJ (1) improperly assessed Claimant's credibility, (*Id.* at 6-9); and (2) failed to accord proper weight to the vocational expert's testimony. (*Id.* at 9-10).

### A.  Combination of Impairments Equivalent to a Listing

Claimant asserts that "[o]bviously, the [Claimant's] physical and mental impairments in combination equal a Listed Impairment," given that he "suffers from the following: osteoarthritis of the lumbar spine and cervical spine, herniated nucleus pulpous of the cervical spine, chronic obstructive pulmonary disease, carpal tunnel syndrome, shoulder impingement syndrome, internal derangement of the knee, history of substance abuse, attention deficit hyperactivity disorder, anxiety, depression and personality disorder." (*Id.* at 5). However, Claimant fails to identify which Listed Impairment is met by his combination of conditions.

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* §§ 404.1525, 416.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

Courts in this jurisdiction have repeatedly rejected as meritless, such arguments as Claimant's where he "does not even attempt to specify which listing" he believes his

conditions meet, because it is the claimant's burden to prove that his condition equals one of the listed impairments. *Thomas v. Astrue*, Civil Action No. 3:09-00586, 2010 WL 4918808, at *8 (S.D.W.Va. Nov. 24, 2010); *see also Vance v. Astrue*, No. 2:11-cv-0781, 2013 WL 1136961, at *17 (S.D.W.Va. Mar. 18, 2013); *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *9 (S.D.W.Va. Jun. 17, 2011); *Spaulding v. Astrue*, No. 2:09-cv-00962, 2010 WL 3731859, at *16 (S.D.W.Va. Sept. 14, 2010). Moreover, substantial evidence supports the ALJ's determination that Claimant's combination of impairments does not equal in severity any of the impairments listed. As the ALJ noted, Claimant does not satisfy Listing 1.02 (major dysfunction of a joint) because he lacks the requisite ambulatory deficits, and not does satisfy Listing 1.04 (disorders of the spine) because there is "no evidence of nerve root impression *[sic]*, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication" (Tr. at 14). Likewise, Claimant does not satisfy Listing 3.02 because there is "no evidence of record to suggest the claimant's forced vital capacity levels were at or below those levels required" in the Listing. (Tr. at 14). Finally, the ALJ appropriately determined that Claimant does not meet any of the Section 12.00 Listings because he has only mild restriction of activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation of extended duration. (Tr. at 14-15). Claimant also failed to establish any of the Paragraph C criteria contained in Listings 12.04 and 12.05 applied, as his mental impairments had not caused "repeated episodes of decompensation of extended duration, inability to adjust to even minimal workplace changes due to residual disease processor inability to function outside a highly supportive living arraignment *[sic]*, for at least one year, or causes complete inability to function independently outside the area of one's home." (Tr.

at 16). The ALJ further noted that "no treating examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." (Tr. at 16).

There is no evidence on record to contradict the ALJ's findings, nor does Claimant offer any additional evidence or argument to support his bare assertion that his combination of impairments equals a Listing. Therefore, the Court rejects Claimant's contention that his physical and mental impairments in combination equal a Listed Impairment.

### B. Determination of Claimant's Credibility

Claimant contends that the ALJ improperly assessed his credibility. (ECF No. 11 at 6-9). He argues the ALJ failed to apply the proper legal standard for assessing credibility and failed to adequately articulate the reasons for discounting Claimant's credibility. (*Id.*). Having carefully reviewed the ALJ's decision, the Court affirms the ALJ's credibility determination.

Pursuant to the Regulations, the ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the

pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques. *Id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5.

In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited
> solely because they are not substantiated by objective evidence of the pain
> itself or its severity, they need not be accepted to the extent they are
> inconsistent with the available evidence, including objective evidence of

the underlying impairment, and the extent to which that impairment can
reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for

those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ provided a detailed overview of Claimant's testimony, (Tr at 17-18), which he then compared and contrasted with the relevant medical evidence and consultative evaluations, in order to assess Claimant's credibility. (Tr. at 18-22). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms he alleged, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 21). As the ALJ observed, Claimant's testimony of disabling symptoms of his impairments was inconsistent with his continued activities of daily living and his testimony regarding his plans to open a coin shop. (Tr. at 20-21). Additionally, the ALJ found that Claimant's prior history of cocaine possession and robbery "undermines his credibility," as does the fact that Claimant's "testimony regarding when he last worked was inconsistent." (Tr. at 21).

Claimant finds it "difficult to understand how the [ALJ] concluded that Plaintiff can perform light and sedentary work" in light of objective medical evidence. (ECF No. 11 at 8). Claimant argues that the physical examinations of Dr. Lowe and Dr. Holley, a 2008 nerve conduction study, as well Ms. Wilson's mental profile examination all

constitute objective evidence substantiating Claimant's allegations of disabling impairments. (ECF No. 11 at 6). Although these studies demonstrate medically determinable impairments relating to Claimant's back, neck, and hands, and mental health, they are largely unsupportive of Claimant's testimony of disabling symptoms of impairments. (Tr. at 237-39, 240-51, 282-87, 308-17). First, Dr. Lowe specifically concluded that although Claimant "is weak around the shoulder, and it will continue to persist. . . he will be able to function. I'll bet if he gets a job on a boat, he will be a good cook and will keep that job." (Tr. at 251). Second, the ALJ accorded "great weight" to the RFC opinions of state agency evaluators, (Tr. at 22), which are all likewise inconsistent with Claimant's testimony of disabling symptoms of impairments. (Tr. at 290-307, 318-25, 343-60, 361). Third, Claimant's nerve conduction study revealed only "moderate right and mild left carpal tunnel syndromes" and "no evidence of ulnar neuropathies" and "no definite evidence of a left cervical radiculopathy," consistent with the ALJ's RFC assessment. (Tr. at 238). Fourth, as the ALJ observed, Claimant's assertion that he cannot work is undermined by his reported activities of daily living, which include grocery shopping, cleaning, doing yard work, feeding and caring for his cat, personal care and hygiene, visiting with his next door neighbor, talking on the phone with his mother, cooking, and handling his finances, among other activities. (Tr. at 21, 178-81, 284). Dr. Boggess explicitly observed that Claimant "appears partially credible as per allegations" in light of noted inconsistencies between Claimant's allegations of functional limitations and the results of objective testing. (Tr. at 306). Finally, a longitudinal review of Claimant's primary care treatment notes reflect only limited difficulty despite Claimant's report of symptoms and relatively conservative treatment. (Tr. at 49, 255-81, 332-42, 418-22). Regarding his allegations of mental impairments,

Claimant does not appear to have ever sought mental health treatment.

In short, it is clear that the ALJ conducted a thorough analysis of the relevant evidence, appropriately weighed the medical source opinions, and provided a logical reason for discounting the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms, in accordance with the applicable Regulations.

Other errors Claimant assigns to the ALJ's credibility determination are likewise meritless. First, Claimant argues that under the "mutually supportive test" recognized in *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987), he satisfies the requirements of 42 U.S.C. § 423(d)(5)(A) because his testimony is supported by objective medical source findings. (ECF No. 11 at 7). Claimant misinterprets the holding in *Coffman.* There, the issue was not whether the ALJ erred in assessing the claimant's credibility, but whether the ALJ applied the appropriate legal standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. *Coffman*, 829 F.2d at 517-18. The Fourth Circuit found that the ALJ had misapplied the relevant standard by discounting the physician's opinion due to the alleged lack of corroborating evidence, when the correct standard was to give the opinion great weight *unless* persuasive contradictory evidence was present in the record. *Id.* at 518. The Fourth Circuit then pointed out that evidence supporting the physician's opinion, in fact, existed in the record, noting "[b]ecause Coffman's complaints and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of. . . 42 U.S.C. § 423(d)(5)(A)." *Id. Coffman* offers no applicable "test" for assessing a claimant's credibility and, consequently, is inapposite. As the written decision in the present case plainly reflects, the ALJ applied the correct two-step process in determining Claimant's

credibility.

Second, Claimant argues that the ALJ's use of "boilerplate" credibility language warrants remand on the ground that such language "provides no basis to determine what weight the [ALJ] gave the Plaintiff's testimony." (ECF No. 11 at 9). It is well established that "ALJ's have a duty to explain the basis of their credibility determinations, particularly where pain and other nonexertional disabilities are involved." *Long v. United States Dep't of Health and Human Servs.*, No. 88-3651, 1990 WL 64793, at *2 n.5 (4th Cir. May 1, 1990). Social Security Ruling 96-7p instructs that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individuals statements." SSR 96-7p, 1996 WL 374186, at *4. Moreover, the ALJ's credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." *Id.* Rather, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.* Thus, a "bare conclusion that [a claimant's] statements lack credibility because they are inconsistent with 'the above residual functional capacity assessment' does not discharge the duty to explain." *Kotofski v. Astrue*, Civil No. SKG-09-981, 2010 WL 3655541, at *9 (D. Md. Sept. 14, 2010); *see also Stewart v. Astrue*, Action No. 2:11-cv-597, 2012 WL 6799723, at *15 n.15 (E.D.Va. Dec. 20, 2012). To the contrary, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

Here, the ALJ admittedly used "boilerplate" language in finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 21). However, the ALJ did not stop his analysis with only that bare conclusion. As discussed above, the ALJ went on to explain that Claimant's ongoing activities of daily living, his plans to open a coin store, his prior criminal history, his inconsistent statements regarding when he last worked, and his lack of any history of mental health treatment all tended to undermine his credibility. (Tr. at 21-22). The ALJ's credibility finding was sufficiently articulated, as he explained his rationale with references to the specific evidence that informed his decision.

Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing Claimant's credibility and weighing medical source opinions.

### C.  Weight Accorded to Vocational Expert's Opinion

Finally, Claimant argues that the ALJ improperly "disregarded the opinion of the vocational expert who testified that the Plaintiff is incapable of substantial gainful activity if the Plaintiff suffers from the limitations enumerated" in Dr. Cloonan's mental RFC opinion. (ECF No. 11 at 9). Although Claimant asserts that the ALJ wrongfully disregarded the vocational expert's opinion, the substance of his objection appears to be with the ALJ's determination of Claimant's mental RFC.

In his written decision, the ALJ assessed Claimant with the mental RFC "to learn and perform routine, repetitive work-like activities in a setting with limited (defined as occasional) interaction with others," (Tr. at 17), based upon the "great weight" he accorded Dr. Cloonan's mental RFC opinion. (Tr. at 22, 359). During the administrative hearing, the vocational expert testified that an individual with Claimant's age,

education, work experience, and RFC would be unable to perform Claimant's past work as a chef, but would be able to perform light and sedentary jobs, each existing in significant numbers in the national and regional economy. (Tr. at 52).

Claimant's attorney subsequently questioned the vocational expert, who opined that "there wouldn't be any jobs [Claimant] could do" if he were accorded full credibility to his testimony "and it was validated or corroborated by the objected medical evidence." (Tr. at 53). Claimant's attorney then proffered Dr. Cloonan's RFC opinion to the vocational expert, and inquired about the "moderate" limitations Dr. Cloonan noted:

CLAIMANT'S COUNSEL:  I guess when you look at that exhibit and there's about seven moderates, in your professional opinion, do those have any cumulative effect on [Claimant's] ability to work?

VOCATIONAL EXPERT:  Are you asking me to take the moderate limitations apart from the section there where the psychologist –

CLAIMANT'S COUNSEL:  Yes, correct.

VOCATIONAL EXPERT:  Well, in my opinion, based on those moderate limitations, there wouldn't be any jobs he could perform.

CLAIMANT'S COUNSEL:  Okay.

VOCATIONAL EXPERT:  Without considering the psychologist.

CLAIMANT'S COUNSEL:  Right. Who says he still retains the ability?

VOCATIONAL EXPERT:  Right.

(Tr. at 54). In his written decision, the ALJ noted both of the hypotheticals posed by Claimant's counsel, but disregarded the Vocational Expert's responses "because the weight of the evidence does not support such a limitation." (Tr. at 23). Claimant now accuses the ALJ of utilizing a "'pick and choose' method . . . to review the medical

evidence," which is both "arbitrary and capricious[,] and prejudicial to the Plaintiff." (Tr. at 10).

On the contrary, it is Claimant who appears to be trying to "pick and choose" advantageous limitations from Dr. Cloonan's RFC opinion. In her summary conclusions, Dr. Cloonan assigned "moderate" limitations to Claimant's abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 358). However, Dr. Cloonan elaborated in her functional capacity assessment that "Claimant *may have* the above moderate limits in concentration, persistence, and pace and social functional capacity associated with his mental condition" but that he was nevertheless "able to learn and perform routine repetitive work-like activities in a setting with limited interactions with others." (Tr. at 359) (emphasis added). Indeed, in the course of soliciting the vocational expert's opinion, Claimant's counsel specifically asked the vocational expert "to take the moderate limitations apart from the section" where Dr. Cloonan opined that "he still retains the ability" to work. (Tr. at 54).

The ALJ's RFC assessment is consistent with Dr. Cloonan's RFC opinion, and is supported by substantial evidence, including Ms. Wilson's adult mental profile, Dr. Boggess' psychiatric review technique and mental RFC opinion, as well as the overall paucity of treatment source records reflecting any significant symptoms of Claimant's

alleged mental impairments. (Tr. at 255-81, 282-307, 332-42, 343-60, 418-22). Claimant offers no additional evidence of limitation relating to his mental impairments.

Accordingly, the record unequivocally establishes that the ALJ fully considered the opinions of both Dr. Cloonan and the vocational expert regarding Claimant's residual capacity to engage in substantial gainful activity. The ALJ's finding that Claimant can perform jobs that exist in significant numbers in the national economy is supported by substantial evidence in the record.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  November 22, 2013.

Cheryl A. Eifert
United States Magistrate Judge